# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARQUIST PIERE BRADFORD,<br><br>Defendant. | No. 2:12-CR-00126-MCE<br><br>**ORDER** |

On January 3, 2013, the parties appeared before this Court regarding a Motion to Suppress made by Defendant Marquist Piere Bradford (hereinafter "Defendant") on August 9, 2012. (ECF No. 17.) Specifically, Defendant requested that the Court suppress all evidence obtained during a search of his residence on the grounds that the search was executed pursuant to an invalid warrant, in violation of the Fourth Amendment.

///
///
///
///
///
///

1

# BACKGROUND[1]

On or about February 5, 2012, J.R., a fifteen-year-old girl who had been working as a prostitute, contacted the Sacramento police. She informed the police that she had just run away from her pimp. J.R. was then interviewed by Detective John Sydow, a Sacramento Sheriff's Department Officer who is also sworn as a Special Deputy United States Marshal ("SDUSM"). Detective Sydow is a member of the Sacramento Crimes Against Children Task Force and is engaged in the full time investigation of the Criminal Sexual Exploitation of Children. At the time of the investigation, Detective Sydow had attended "no fewer than 100 hours of training on the topics of prostitution, pimping, and human trafficking, specifically the Commercial Exploitation of Children." (ECF No. 17-1 at 7.) He had also received training specifically designed for interviewing adolescent victims of sex trafficking. (Id.)

During the interview, J.R. stated that she knew her pimp as "King Kutta Mackin," and that she had been one of King Kutta Mackin's prostitutes for approximately two weeks. According to J.R., she had started working as a prostitute eighteen months prior due to an unstable family life. She told Detective Sydow that she had been recruited by her current pimp, "King," on facebook.com, after another prostitute referred J.R. to him. J.R. stated that after several weeks of communication with "King" on facebook.com, he purchased a bus ticket for her to come from Fresno to Sacramento to work for him as a prostitute. Once she arrived in Sacramento, J.R. moved in with "King."

J.R. showed Detective Sydow her pimp's page on facebook.com. Review of that page showed numerous references to "King" pimping. His role in pimping and prostitution was alluded to through both text and photographs. One post described a photo of "King" and his "bottom," a term used to refer to a pimp's senior prostitute.

///

---

[1] The following recitation of facts is taken from the Affidavit of John Sydow in Support of Search Warrant. (ECF No. 17-1 at 6-19.)

2

1 | Another post stated that "King" was looking for a "bad ass wifey," another reference to a
2 | prostitute. A different post by "King" stated "I am a P," meaning "I am a pimp."
3 |       J.R. informed Detective Sydow that her pimp hit her when he became angry with
4 | her, and that he had done so that day. J.R. showed Detective Sydow bruises on her left
5 | shoulder and left arm.
6 |       J.R. also gave a detailed description of a particular phone that "King Kutta
7 | Mackin" had given to her for the purpose of working as a prostitute. J.R. informed
8 | Detective Sydow that the phone was likely still located inside King's apartment. She also
9 | listed a number of cities where they had worked, and gave details about the amount of
10 | money that she had received for prostitution, which J.R. stated she had given to "King."
11 |       J.R. then showed Detective Sydow where "King" lived, on Don Juan Drive. A
12 | comparison of that address showed that it belonged to Defendant, who had been
13 | arrested at that same address three months prior. At the time of his prior arrest,
14 | Defendant had stated that the Don Juan residence was his home address. A photo of
15 | Defendant was obtained, and J.R. then identified Defendant as her pimp, "King." This
16 | photo was also compared with a photograph of "King Kutta Mackin" post on
17 | facebook.com. The photographs depicted the same person: Defendant.
18 |       Detective Sydow then obtained and executed a search warrant for Defendant's
19 | apartment, where the evidence at issue was recovered.

## STANDARD

"A search warrant, to be valid, must be supported by an affidavit establishing probable cause." United States v. Stanert, 762 F.2d 775, 778 (9th Cir. 1985). "The issuance of a search warrant by a magistrate is reviewed for clear error to determine whether the magistrate had a substantial basis to conclude that the warrant was supported by probable cause." United States v. Celestine, 423 F.3d 1095, 1100 (9th Cir. 2003) (citing United States v. Wright, 215 F.3d 1020, 1025 (9th Cir. 2000)).

3

Probable cause is a "fluid concept not readily, or even usefully, reduced to a neat set of legal rules." Stanert, 762 F.2d at 778. Thus,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Id. at 778-79 (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)).

## ANALYSIS

Defendant argues that Detective Sydow's affidavit in support of the search warrant does not set forth probable cause to issue the search warrant for Defendant's residence. (ECF No. 17 at 3.) Defendant also argues that the good faith exception to the exclusionary rule does not apply in this case because the affidavit in support of the warrant precludes reasonable reliance on its face. (Id. at 5.)

"[T]o determine whether an informant's tip is sufficient to support a finding of probable cause, a court must use a 'totality of the circumstances approach' that takes into consideration the informant's 'veracity' or 'reliability' and his 'basis of knowledge.'" United States v. Wall, 277 F. App'x 704, 705 (9th Cir. 2008) (quoting Gates, 462 U.S. at 238). Courts look to several factors to determine the reliability of an informant's tip. "First, a known informant's tip is thought to be more reliable than an anonymous informant's tip." United States v. Rowland, 464 F.3d 899, 907 (9th Cir. 2006) (citing Florida v. J.L., 529 U.S. 266, 271 (2000); Adams v. Williams, 407 U.S. 143, 146–47 (1972)). "That is because an anonymous informant typically cannot be questioned about the basis for knowing the information or motive for providing the tip, nor can the anonymous informant be held accountable for providing false information in violation of the law." Id. at 907-08 (citing J.L., 529 U.S. at 271; Adams, 407 U.S. at 146–47).

///

4

"Second, an informant with a proven track record of reliability is considered more reliable than an unproven informant." Id. at 908 (citing Adams, 407 U.S. at 146–47). "Third, the informant's tip is considered more reliable if the informant reveals the basis of knowledge of the tip—how the informant came to know the information." Id. (citing Spinelli v. United States, 393 U.S. 410, 416 (1969), abrogated on other grounds by Gates, 462 U.S. at 238). "Finally, a tip that provides detailed predictive information about future events that is corroborated by police observation may be considered reliable, even if the tip comes from an anonymous source." Id. (citing Alabama v. White, 496 U.S. 325, 329-30 (1990); Gates, 462 U.S. at 243–45; Draper v. United States, 358 U.S. 307, 313 (1959)). "Predictive information that reveals a detailed knowledge of an individual's intimate affairs is more reliable than predictive information that could be observed by the general public . . . ." Id. (citing White, 496 U.S. at 332; J.L., 529 U.S. at 272). Additionally, "such self-verifying detail is considerably more valuable if it relates to suspicious activities than if it relates to innocent activities . . . ." Id. (citing Gates, 462 U.S. at 245 n. 13).

In the present case, several factors weigh in favor of finding J.R.'s tip to law enforcement to be reliable. First, J.R., made herself known to law enforcement agents, and one of the agents met with the informant personally. See Rowland, 464 F.3d at 908 (citing United States v. Romain, 393 F.3d 63, 73 (1st Cir. 2004) (noting that face-to-face encounter with informant significantly bolsters reliability)). Further, J.R did not have any apparent motive to lie or fabricate the tip.[2] See id. (citing United States v. Terry-Crespo, 356 F.3d 1170, 1176 (9th Cir. 2004)).

---

[2] Defendant attempts to use Detective Sydow's statement that "Prostitutes routinely lie about the identity or existence of their pimps to law enforcement to protect the pimp's identity" to reach the conclusion that "prostitutes routinely lie." (ECF No. 17 at 5.) However, Detective Sydow's affidavit clearly states that "prostitutes will often refuse to divulge the identity of their pimps to law enforcement," (ECF No. 17-1 at 13), that pimps "attempt to 'train' the prostitute[s] what to say and what not to say to law enforcement during interrogations," (id.), and that "pimps at times use physical force and/or fear to control their prostitutes," (id. at 14). J.R.'s interview with Detective Sydow clearly presents the opposite situation—rather than protecting the identity of her pimp, J.R. was divulging his identity. Defendant offers nothing to explain why J.R. would risk her personal safety by running from her pimp, compromise her penal interests by coming forward to law enforcement to relate her activity as a prostitute, and then lie about the identity of her pimp. These circumstances bolster J.R.'s credibility rather than detract from it.

J.R.'s credibility is particularly bolstered by the fact that her statement to law enforcement agents included statements against her penal interests. See United States v. Harris, 403 U.S. 573, 583 (1971) (observing that informant's statements against penal interest serve as additional reason for crediting informant's tip). Indeed, "[p]eople do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." Id. Accordingly, this factor weighs in favor of a finding that J.R.'s tip was reliable, and thus that the affidavit set forth probable cause.

However, J.R. did not have a "proven track record of reliability" as an informant. Rowland, 464 F.3d at 907-08. The Government contends that "[a]lthough J.R.'s record was short by the time the SDUSM sought that warrant, much that she had told them had already been proven out." (ECF No. 18 at 7.) The Government argues that this circumstance gives J.R. a track record of reliability. (Id.) But case law from district courts within the Ninth Circuit establishes that an informant's "track record of reliability" is not established during an informant's first meeting with law enforcement agents. Cf. United States v. Beals, 2012 WL 2339745, at *2 (E.D. Cal. June 19, 2012) (finding informant had reliable track record when agent had prior experience with informant in which she had consistently provided only reliable information); United States v. Diaz-Diaz, 2012 WL 92982, at *2 (D. Or. Jan. 10, 2012) (finding reliable track record when informant had provided reliable information in other criminal investigations); United States v. Martinez, 2009 WL 4885185, at *3 (W.D. Wash. Dec. 17, 2009) (finding informant had reliable track record when informant had worked for law enforcement agent for over two years and her information led to charges against approximately twenty defendants, and had never lied to agent or failed to do what was expected of her as a confidential informant), aff'd, 431 F. App'x 563 (9th Cir. 2011); see also United States v. Angulo-Lopez, 791 F.2d 1394, 1397 (9th Cir. 1986) (stating that "if the informant has provided accurate information" in the past, and the past information

"involved the same type of criminal activity as the current information, the inference of trustworthiness is strong"). While J.R.'s statements made during her interview with Detective Sydow did prove reliable, such reliability does not amount to a "proven track record." Accordingly, this factor weighs against a finding that Detective Sydow's affidavit set forth probable cause.

Third, J.R.'s tip revealed how she came to know the information that she reported to Detective Sydow, which indicates the tip's reliability and weighs in favor of finding that the affidavit set forth probable cause. Rowland, 464 F.3d at 908 (citing Spinelli, 393 U.S. at 416). J.R. told Detective Sydow exactly how she came to know the information at issue. Specifically, she explained to Detective Sydow that she worked as a prostitute for "King" and that she lived with "King" at his apartment. J.R. also told Detective Sydow that she saw Defendant use the website myredbook.com to post advertisements for J.R.'s prostitution services.

Because J.R.'s tip was not one that provided detailed predictive information about future events, the final Rowland factor is inapplicable to the Court's analysis.

In considering the totality of the circumstances in this case, several other facts are important. J.R. led Detective Sydow to the apartment matching the address of record for Defendant, and the picture of "King Kutta Mackin" on facebook.com matched a color booking photograph of Defendant from his arrest on November 1, 2011. Furthermore, J.R. identified the person in the booking photograph as "King Kutta Mackin," and stated that he was her pimp. On facebook.com, the page of "King Kutta Mackin" displayed pictures of Defendant and comments relating to pimping and prostitution.

Thus, the information that Detective Sydow received from J.R. about Defendant's activity as a pimp, along with the corroborating evidence from facebook.com posted by Defendant himself, and the fact that the apartment J.R. led Detective Sydow to was listed as Defendant's address, are together sufficient to "revea[l] a fair probability" that contraband or evidence of Defendant's illegal activities would be found at Don Juan Drive. See Celestine, 423 F.3d at 1100.

Accordingly, the magistrate judge did not clearly err in determining that the warrant was supported by probable cause. See id. at 1102.

Moreover, contrary to Defendant's assertions at oral argument, there is no requirement that police check every potential source of available information to establish probable cause. For example, Defendant Sydow was not required to review the redbook.com advertisements that J.R. described to corroborate her statement that such advertisements existed, or that "King" used redbook.com for prostitution activities. The only requirement is that the affidavit establishes, under the totality of the circumstances, "a fair probability that contraband or evidence of a crime will be found" in a particular place. See Gates, 462 U.S. at 238.

**CONCLUSION**

Under the totality of the circumstances in this case, the Court finds that Detective Sydow's affidavit in support of the search warrant demonstrates probable cause, as it reveals a fair probability that contraband or evidence of a crime would be found at the Defendant's residence at Don Juan Drive. As such, the Magistrate Judge's issuance of the warrant was not clearly erroneous.

Accordingly, it is hereby ordered that Defendant's Motion to Suppress (ECF No. 17) is DENIED.

IT IS SO ORDERED.

Dated: January 15, 2013

_____
MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT COURT